**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PAUL ABRAMSON, on behalf of himself and all

others similarly situated,

    Plaintiff,

vs.                                                  Case No.: 1:24-cv-6884

We Catch Em, Inc.,,

    Defendant.

_____/

**Declaration / Report of Robert D Moody**

I, Robert D. Moody, declare that I have read the preceding instrument, and the facts and information stated in it are true and correct to the best of my knowledge. I am personally acquainted with the facts stated herein.

1. I am the President, CEO, and Founder of Forensic Data Services, Inc. (d/b/a FDS Global) (hereafter referred to as FDS), a company based in Broward County, Florida.

2. The Law Firm of GABRIEL A. LEVY, P.C., retained by my firm (FDS) for the benefit of its client, PAUL ABRAMSON.

3. The Plaintiff, PAUL ABRAMSON, has established that he is visually impaired and asserts his rights under the Americans with Disability Act (ADA).

4. I have been retained to provide consulting services, including website auditing, which includes compliance, usability, and accessibility standards (WCAG 2.0), as well as general functionality analysis for disabled users.

5. My duties with FDS include being the principal investigator and testifying expert.

6. My compensation is set at the hourly rate of $450 per hour for technical work and $750 per hour for testifying and preparation for testifying.

7. My compensation for my consulting services and the generation of this Declaration / Report is capped at $2,500.00. All other consulting work and all testimony will be at the above rate.

8. I am certified in Information Systems Auditing, Information Security, and Computer Forensics. Additionally, I have received training relating to my work in this matter and provided my CV to fully describe my education, certification, training, and testifying background. My CV is attached as **Exhibit 1**.

9. Specific to websites and their functionality, I have experience in the design, layout, coding, auditing, and testing of functionality, security, and operability of websites and their content.

10. Regarding ADA Compliance, I have audited, directed, and directly supervised more than 5,000 websites to date. This work includes sites for all major industries operating on many different platforms.

11. My work has identified websites that were both WCAG-compliant and non-compliant with WCAG.

12. For the websites found to be non-compliant, defendants have often relied on my work to bolster their remediation efforts and effectively correct the issues they faced.

13. In the present matter, FDS, with me as the principal investigator, was retained by Plaintiff's counsel on behalf of Plaintiff, a visually impaired user of the Internet, to determine whether We Catch Em, Inc.'s website(s) had issues that could not be overcome and acted as barriers to their use and enjoyment of the website.

14. In this case, the Defendant's website consists of a single URL. The URL examined was:

    a. https://mj2fishing.com/

15. The Plaintiff alleges the following issues:

    A. Heading hierarchy was not properly defined, and there were missing heading levels. As a result, quick navigation through headings on the website did not help the Plaintiff effectively find the content and understand the logical structure of the home page.
    B. Multiple heading level 1 tags per page confused the outline of content. While HTML permits multiple "h1" tags, it is not beneficial for screen reader users. The Plaintiff, using keyboard shortcuts, struggled to identify the main section due to repetitive h1 tags.
    C. The Plaintiff encountered links that were incorrectly implemented: they were not interactive. As a result, legally blind user could not access the destination page to which the link should lead.
    D. The Navigation menu did not allow the repeated content to be expanded or collapsed, and it expanded automatically after receiving focus.
    E. The Navigation sub-menus with drop-down lists did not announce their state - "collapsed" or "expanded". The Plaintiff could not determine in which part of the sub menu the keyboard focus was located or if the links were skipped.
    F. Several links had ambiguous texts that were unclear to the Plaintiff. Lack of detailed description of the link target and destination page made it difficult for the Plaintiff to perceive their purpose.

16. I found that the issues identified by the Plaintiff did exist.

17. Additionally, the Defendant's website revealed the following issues:

    1. Frames must have an accessible name.
    2. Images must have alternate text
    3. Links must have discernible text
    4. Styled <p> elements must not be used as headings
    5. Elements must meet minimum color contrast ratio thresholds
    6. Elements must only use permitted ARIA attributes
    7. <video> elements must have captions
    8. CSS Media queries must not lock display orientation
    9. Focus indicator is missing
    10. Function cannot be performed by keyboard alone
    11. Text should not be marked as a heading
    12. Text alternative is missing

18. The 12 issues identified above point to specific problems with the Defendant's website. These issues include:

    A. Images are complex for visually impaired users to interpret because of the color contrast, aspect ratio, and lack of alternate text that a screen reader can read.

    B. Programming elements such as improper headings and ARIA statements make it difficult for assistive technologies to interpret the website and provide a fluid, meaningful interaction for the impaired user.

    C. The Defendant's website is not designed to permit navigation through the keyboard alone. This failure in design makes it difficult for impaired users to navigate the Defendant's website.

19. As stated above, FDS uses tools provided by Deque.com as part of its audit. These tools help the reader contextualize the seriousness of the issues by understanding their weight. The Deque Scorecard is presented below.

20. The Deque Scorecard identified **108 issues** and categorized them as follows:

| Critical | Serious | Moderate | Minor | Color Contrast | Other |
|---|---|---|---|---|---|
| 36 | 12 | 0 | 0 | 57 | 3 |

To better understand the categories provided above, the following descriptions are provided:

    a. **Critical** - This issue results in blocked content for people with disabilities and will partially prevent them from accessing fundamental features or content. This type of issue puts your organization at risk.

    b. **Serious**—This issue results in barriers for people with disabilities and partially prevents them from accessing fundamental features or content. As a result, people relying on assistive technologies will experience significant frustration.

    c. **Moderate** - This issue creates barriers for people with disabilities but will prevent them from accessing fundamental features or content.

    d. **Color Contrast**—This issue results from an organization not ensuring a proper ratio between the foreground and background of text and pictures. The correct ratio must be 4.5:1 for standard text and 3:1 for large text. Failure to meet this standard creates barriers for disabled users, especially visually impaired users.

    e. **Other**—This issue identifies issues based on what has been determined as a best practice. When taken into account along with items a. through d., a minor problem could be elevated to a critical or severe barrier.

21. The issues listed above and referenced by the automated testing (**108 issues**) identify barriers that would prevent a disabled person from using and enjoying the Defendant's website. A more detailed report of the problems is attached as **Exhibit 2**.

22. Recipients are not required to take action that would constitute a fundamental alteration like a program or activity or an undue financial or administrative burden. As discussed in the NPRM, 137 and consistent with DOJ's 2022 guidance on web accessibility 138 and DOJ's recent proposed title II rulemaking, "Nondiscrimination based on Disability: Accessibility of Web Information and Services of State and Local Government Entities," 139 the Department does not believe that a phone line, even if it is staffed 24 hours a day, can realistically provide equal opportunity to people with disabilities. Websites and often mobile apps allow public members to get information or request a service within just a few minutes and usually to do so independently. Getting the same information or requesting the same service using a staffed phone line takes more steps, resulting in wasted time or difficulty getting the information. In addition, a staffed telephone line may not be accessible to someone who is deaf or blind or may have a combination of other disabilities, such as a coordination issue impacting typing and an audio processing disability impacting comprehension over the phone. However, such individuals may be able to use web content and mobile apps that are accessible.

**Conclusion:**

23. The issues identified by the Plaintiff involve design, logic, and structural flaws in the website.

24. As for FDS testing, the issues identified by the Plaintiff were found to exist and continue to exist today.

25. FDS testing shows numerous issues specific to WCAG, referenced in Exhibit 2.

26. Given all of the above and considering the issues identified, I can say with a high degree of scientific certainty that the website https://mj2fishing.com/ has defects. These defects serve as barriers that create problems for visually disabled persons and have a direct and immediate effective use and enjoyment of the site for persons with low to no vision. Furthermore, as found on the Defendant's website, these defects do not comply with WCAG 2.0/2.1.

27. I reserve the right to update, alter, change, delete, and supplement this declaration in the alternative file if provided with additional relevant material.

**DECLARANT FURTHER SAYETH NOT.**

Under penalty of perjury, I affirm that the preceding statements are true and correct.

*Robert D. Moody*
_____
**Robert D. Moody**
Rmoody@fds.global
Date:   09/26/2024